IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| A.C., and D.C., Parents and Natural Guardians, and on behalf of Minor Plaintiff, C.C.<br><br>Plaintiffs,<br>v.<br><br>OWEN J. ROBERTS SCHOOL DISTRICT<br><br>Defendant. | CIVIL ACTION NO. 20-2046 |

## MEMORANDUM OPINION

**Rufe, J.**                                                                                                  **August 12, 2021**

This case arises under the Individuals with Disabilities Education Act ("IDEA"),[1] Section 504 of the Rehabilitation Act of 1973,[2] and the Americans with Disabilities Act ("ADA").[3] C.C., a student with disabilities ("Student"), attended public school in the Owen J. Roberts School District ("District") and received special education services. His parents, A.C. and D.C. ("Parents"), filed this action after an unfavorable administrative decision by a Hearing Officer.[4] The parties have filed cross-motions for judgment on the administrative record as to the first cause of action, which alleges that the District violated Section 504 and denied Student an appropriate education.[5]

---

[1] 20 U.S.C. §§ 1400, *et seq.*

[2] 29 U.S.C. § 794.

[3] 42 U.S.C. §§ 12131, *et seq.*

[4] *See* 20 U.S.C. § 1415(i)(3)(A).

[5] The second and third causes of action, alleging that the District engaged in retaliation in violation of Section 504 and the IDEA, are not addressed in this Memorandum.

I.   **LEGAL STANDARDS**

Section 504 provides that:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . .[6]

To establish that the District violated Section 504, Parents must prove that (1) Student is "disabled" as defined by the Act; (2) Student is "otherwise qualified" to participate in school activities; (3) the District receives federal assistance; and (4) Student was excluded from participation in, denied the benefits of, or subject to discrimination at, the school.[7]

Under the regulations implementing Section 504, federally-funded schools "shall provide a free appropriate public education" ("FAPE") to each qualifying disabled student.[8] A district must educate disabled students "with persons who are not handicapped to the maximum extent appropriate" and evaluate a student's specific areas of educational need before placement.[9] Schools are required to provide education and services that "are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met" and that satisfy regulatory requirements for educational setting, evaluation, placement, and procedural safeguards.[10]

---

[6] 29 U.S.C. § 794(a).

[7] *See Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007) (quoting *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999)).

[8] 34 C.F.R. § 104.33(a).

[9] 34 C.F.R. §§ 104.34(a), 104.35.

[10] 34 C.F.R. § 104.33(b)(1) (referencing 34 C.F.R. §§ 104.34, 104.35, 104.36).

"The IDEA and Section 504 are similar causes of action," and often the same conduct is used to form the basis for claims under both statutes.[11] Moreover, the reasonable accommodation analysis used for Section 504 "comports with the IDEA's guidance that an appropriate education must provide significant learning and confer a meaningful benefit."[12] The Court of Appeals for the Third Circuit has not decided whether the applicable standard for the review of a hearing officer's decision in an IDEA case also applies in a Section 504 case, and Parents argue that the Section 504 claims should be reviewed entirely *de novo*. However, considering the similar nature of the claims brought under the IDEA and Section 504, and considering that the claims were all part of the same administrative process, the Court will apply the IDEA's modified *de novo* review standard to Plaintiffs' Section 504 claim.

The "modified *de novo*" standard of review requires the court to give "due weight" and "deference" to the findings in the administrative proceedings.[13] "Although the District Court must make its own findings by a preponderance of the evidence," factual findings of the hearing officer, such as whether a school district fulfilled its obligation to provide a FAPE, are considered prima facie correct.[14] If the reviewing court does not adhere to any factual findings, it must explain why. Additionally, credibility determinations based on live testimony are given "special weight," and the court must accept them "unless the non-testimonial, extrinsic evidence

---

[11] *Jack J. through Jennifer S. v. Coatesville Area Sch. Dist.*, No. 17-3793, 2018 WL 3397552, at *14 (E.D. Pa. July 12, 2018) (citing *Andrew M.*, 490 F.3d at 349).

[12] *Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.,* 799 F. Supp. 2d 473, 490 (E.D. Pa. 2011).

[13] *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010); *see also Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199–200 (3d Cir. 2004); *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).

In IDEA actions, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

[14] *Shore*, 381 F.3d at 199 (citing 20 U.S.C. § 1415(1)(2)(B)(iii)); *see also D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (noting that such factual findings are subject to clear error review).

in the record would justify a contrary conclusion."[15] The hearing officer's legal conclusions are reviewed *de novo*.[16] "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged."[17]

## II.     DISCUSSION

Student is a gifted child with complex medical conditions that manifest with both physical and behavioral symptoms. Student sometimes missed school, either for medical treatment or because he refused to attend. Student had a Gifted Individualized Educational Plan ("GIEP") in place, as well as an Individual Health Plan and an Emergency Care Plan.

During Student's 6th grade year, Parents and the District agreed upon a Plan under Section 504 setting out accommodations to be provided at school. This Section 504 Plan (implemented March 13, 2017) provided that:

> The following related aids, services, or accommodations have been agreed upon by the school district and the parents in addressing this student's educational needs:
>
> 1. Utilize student agenda daily for material and assignment management. Teachers will check for accuracy.
> 2. Reduce visual distractions. Provide student with preferential seating close to the primary source of instruction
> 3. Provide student with discrete, verbal reminders to self-advocate for additional time when needed
> 4. Provide extended time for assignment and assessment completion (prior to formal due dates)
> 5. Prompt student to review classwork and assessments for completion and accuracy prior to final submission for grading
> 6. Provide breaks during extended writing assignments

---

[15] *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995); *see also Shore*, 381 F.3d at 199 ("In this context[,] the word 'justify' demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court.").

[16] *S.H.*, 336 F.3d at 270.

[17] *Ridley Sch. Dist. v. M.R.,* 680 F.3d 260, 270 (3d Cir. 2012).

7. Prompt student to utilize dictation app for written responses when appropriate. [Student] will receive technical assistance and support from staff when necessary
8. Provide student with the option to type assignments
9. Provide "think time" for open ended responses (verbal and nonverbal).
10. Reduce need to copy visual material. Student will practice note-taking skills, but study guides and/or teacher notes will be provided for assessed material.
11. Student will be assessed in a small group, with non-distractible peers, for PSSA and Keystone assessments
12. OT to trial sensory alerting strategies with student and consult with teachers
13. OT will consult with educational staff to provide support strategies related to visual motor activities (chunking, masking assignments, color coding, etc.)
14. Share schedule changes with student when appropriate
15. Allow student to stand when completing work assignment.
16. 504 case manager will schedule a transition meeting at the beginning of each school year (within the first two weeks of school) to review [Student]'s 504 and health plan with teachers
17. OT will provide student with strategies to develop and strengthen organizational skills
18. At parent request, musical instruments are to be left at school. Parent will provide additional set at home for practice.[18]

In the summer of 2017, Parents disagreed with the results of an evaluation and with the District's proposed Individualized Educational Plan ("IEP") for Student. The parties also did not agree upon a new Section 504 Plan. In October of 2017, the District unilaterally discontinued the March 2017 Section 504 Plan.[19] In response, Parents filed an administrative complaint with the U.S. Department of Education, Office for Civil Rights ("OCR").

---

[18] Email from Caroline Gatto, 7th Grade Counselor, to Teachers (Aug. 21, 2017) [Doc. No. 8-15 at 59–60] (distributing Section 504 Plan and asking teachers to review). Because of the size of the administrative record, and the size of certain exhibits, the Court cites to the ECF document and page numbers.

[19] Plaintiffs contend that the removal of the Section 504 Plan was an act of retaliation by the District. This claim is not part of the current motions.

In May 2018, the District entered into an agreement with OCR to resolve the administrative complaint. In relevant part, the resolution agreement provided that within three school days of the effective date of the agreement, the District would "implement all disability-related plans for which it has necessary parental consent," which at a minimum would "include the Student's most recently agreed upon Section 504 Plan and Individual Health Plan."[20] The District further agreed to meet and review whether Student "suffered an educational loss due to the District's failure to provide appropriate regular and/or special education or related aids/services to the Student from May 2017 to the present," including disability-related services under Section 504.[21] The District then re-implemented the March 2017 Section 504 Plan, which had not been in effect between October 2017 and May 2018, or for almost all of Student's 7th grade year.

Throughout Student's 8th grade year, Parents and the District remained unable to reach common ground, and on February 23, 2019, Parents filed a state administrative due process complaint. Parents contended that Student was denied a FAPE between October 2017 and May 2018, during the time when no Section 504 Plan was in place. Parents also amended their complaint to assert that the District had discriminated against Student and denied a FAPE by not providing homebound instruction in May 2019 and September and October of 2019.[22] On or about November 1, 2019, during Student's 9th grade year, Student and Parents moved out of the District.

---

[20] Resolution Agreement, OCR Case No. 03-18-1007 [Doc. No. 8-40 at 41].

[21] *Id*. at 42.

[22] A FAPE is "an educational instruction 'specially designed . . . to meet the unique needs of a child with a disability,' coupled with any 'related services' that are 'required to assist a child with a disability to benefit from [that instruction].'" *Winkelman ex rel. Winkelman v. Parma City Sch. Dist*., 550 U.S. 516, 524 (2007) (quoting 20 U.S.C. §§ 1401(26)(A), (29)) (citations omitted).

The Hearing Officer conducted multiple days of hearings, took testimony, and received evidence. The Hearing Officer determined in a written opinion that Student had not been denied a FAPE and resolved the complaint in favor of the District in all respects. Parents then filed this action challenging this decision. The administrative record, which is several thousand pages in length, has been filed. The Court now considers two issues: whether Student was denied a FAPE because of the removal of the Section 504 plan; and whether Student was denied a FAPE for failure to provide homebound services.

### A. Removal of the Section 504 Plan

The Hearing Officer concluded that the District's unilateral decision to discontinue the Section 504 Plan constituted a procedural violation, but that Parents had not established that there was a loss, exclusion, or denial of benefits.[23] Thus, the Hearing Officer determined that Student was not denied a FAPE.

As a preliminary matter, the Hearing Officer determined that a written Section 504 Plan was not required by the federal statute or regulations. Additionally, the Hearing Officer held that although state law did require a written document, state law could not enlarge or expand rights under Section 504.[24] The Hearing Officer then determined that "the teachers cogently and credibility testified, and the non-testimonial extrinsic evidence supports, a finding that each teacher, even after the District unilaterally discontinued the written Section 504 agreement, continued to implement the existing accommodations."[25] The Hearing Officer concluded that Student had not been denied a FAPE, as he "excelled in the regular education curriculum,

---

[23] Hearing Officer Decision at 36 [Doc. No. 8 at 44].

[24] *Id.*

[25] *Id.*

mastered the GIEP goals, earned high grades in honors math, and was promoted to the next grade."[26]

The Court has reviewed carefully the voluminous record in this case. It is undisputed that the teachers and staff were aware the District unilaterally withdrew the Section 504 Plan. The record does support a finding that some of the teachers continued to implement at least some of the provisions of the Section 504 Plan as "best practices."[27] However, the record does not support the conclusion that all teachers fully implemented the Plan while it was withdrawn, or that the occupational therapy aspects of the Plan continued. Geoff Ball, the special education supervisor, acknowledged that the occupational therapy aspects of the Section 504 Plan stopped. He further testified that he could not say that every teacher continued with every accommodation in the Plan.[28]

Furthermore, on May 23, 2018, after the District reinstated the Section 504 Plan as part of the OCR complaint resolution, Mr. Ball wrote to Parents that "[a]ll of [Student's] teachers have been provided with and signed off that they have received and reviewed [Student's] last agreed upon 504. They *will implement* the accommodations in the 504. It is my understanding that you and the Middle School team have agreed that [Student] will not have homework the remainder of the year . . . I have reached out to the OT who will be touching base with the team and with [Student]."[29] The record does not support an inference that the Section 504 Plan remained

---

[26] *Id.* at 37 [Doc. No. 8 at 45].

[27] N.T. Courtney Campbell, Plaintiff's 7th grade language arts teacher, at 550–51 [Doc. No. 8 at 160]. Ms. Campbell testified that she coordinated with the gifted teacher, Ms. Bickel, but also testified that she could not speak to the occupational therapy aspects. *Id.* at 543, 548 [Doc. No. 8 at 158, 159].

[28] N.T. Geoff Ball, the special education supervisor, at 388 [Doc. No. 8 at 289]. The lack of OT is supported by an "Occupational Therapy Log" dated December 22, 2017, that includes consultations through May 31, 2017, but none for the fall of 2017, when the Section 504 Plan had been discontinued. Occupational Therapy Log Dated 12/22/2017 [Doc. No. 8-15 at 52–58].

[29] Email from G. Ball to Parents (May 23, 2018) [Doc. 8-40 at 64] (emphasis added). The email also invited Parents to participate in a multi-disciplinary team meeting which was "to determine whether [Student] suffered educational

substantially implemented after the District withdrew it. The Hearing Officer therefore erred in concluding otherwise.

However, the fact that the Section 504 Plan was not in effect and not fully followed is not dispositive. The Third Circuit has held that a procedural violation constitutes a denial of a FAPE "only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits."[30] "There are no bright line rules to determine when a school district has provided an appropriate education as required by § 504 and when it has not."[31] Although the Third Circuit has not specifically addressed the issue in this context, "a reasonable accommodation analysis comports with the Third Circuit's explanation that an 'appropriate' education must provide 'significant learning and confer meaningful benefit.'"[32]

Thus, the lack of a required plan does not result in a denial of a FAPE unless there is specific evidence of an educational deprivation.[33] Upon consideration of the administrative record, the Hearing Officer's decision, and the parties' briefing, the Court concludes that Parents have not shown that Student was denied meaningful benefits or that the District failed to provide significant learning despite the improper withdrawal of the Section 504 Plan.

Parents argue that "Student, a gifted student, received good grades, when he was able to attend school and do the work, but in other aspects of his education, such as his social,

---

loss due to the district's failure to provide appropriate regular and/or special education or related aids/services from May 2017 to present." *Id.* Although it appears that meetings were held, the record does not show that any determination was made as to educational loss.

[30] *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010).

[31] *Molly L. ex rel. B.L. v. Lower Merion Sch. Dist.*, 194 F. Supp. 2d 422, 427 (E.D. Pa. 2002).

[32] *Id.* at 428 (quoting *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000)).

[33] *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 69 (3d Cir. 2010).

emotional, behavioral development, and his medical and physical disabilities, he had significant deficits that were left unaddressed by the District."[34] Social, emotional, and behavioral development are important aspects of an education.[35] But Parents have not shown the ways in which Student was denied any of these aspects through the withdrawal of the Section 504 Plan.

The Plan focused on issues such as organization, minimizing distraction, and providing large-print documents, and did not encompass social or emotional needs, which the record does not show were a problem at school. While the Section 504 Plan is unquestionably important, Student successfully completed the school year without it, and the record does not support Parents arguments relating to social or emotional deficits. Parents have not shown that there was a connection between the lack of the Section 504 Plan and specific impairments of Student's educational progress or with Student's absences from school.

### B. Homebound Services

In May 2019, Student's 8th grade year, and September and October of 2019, Student's 9th grade year, Student missed periods of school both because of physical illness and because he refused to attend. Parents argue that the District discriminated against Student by failing to provide homebound instruction covering these periods.

In March and April 2019, Parents requested in-home academic support for after school and summer,[36] and on April 29, 2019, the District approved some degree of homebound services

---

[34] Pl.'s. Mem. Supp. Mot. Judgment [Doc. No. 19] at 14.

[35] *Jana K. ex rel Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 595 (M.D. Pa. 2014) (citing *M.C. v. Central Reg'l Sch. Dist.*, 31 F.3d 389, 393–94 (3d Cir. 1996) (noting that education includes "the social, emotional, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential.").

[36] Hearing Officer Decision at 21–22 [Doc. No. 8 at 30–31]; *see also* Email from Parents to G. Ball (Mar. 24, 2019) [Doc. No. 8-45 at 12]. Parents requested "in home math teacher tutoring support" and "in home summer math teacher tutoring support" on February 28, 2019. Email from Parents to School Officials (Feb. 28, 2019) [Doc. No. 8-45 at 24–25].

for a three-month period.[37] The homebound instruction was not a replacement for in-school instruction, but a supplementation of several hours each week. In early May 2019, soon after the homebound instruction began, Student threw a remote control that hit the instructor. After this event, the District declined to continue intermittent instruction in the home but offered to provide services at another location.[38]

The question of homebound instruction arose again at the beginning of Student's 9th grade year, as the prior three-month period of homebound services had ended, and additional services required approval. Around September 9, 2019, Student stopped attending school, and in October 2019, the District received letters from a behavioral support specialist and from Student's doctor requesting intermittent homebound instruction.[39] The District denied the request at that time. Joseph Milnes, a supervisor of special education for the District, testified that the District determined that Student was not attending school because of behavioral and mental-health related reasons and the better course of action would be to have Student in school where he could work with licensed professional counselors and where a nurse was available to attend to his needs.[40] Mr. Milnes also testified that the District was willing to offer intermittent homebound instruction to help Student catch up on missed work, similar to the previous

---

[37] Letter from Superintendent to Parents, Memorializing approval of homebound instruction by School Board (Apr. 30, 2019) [Doc. No. 8-47] at 2.

[38] Hearing Officer Decision at 23 [Doc. No. 8 at 31]. *See* Email from G. Ball to Parents (May 2, 2019) [Doc. No. 8-47 at 16] (stating that the teachers have been instructed to coordinate with Parents to find a neutral location outside the home for instruction); Email from G. Ball to Parents (May 7, 2019) [Doc. No. 8-47 at 22] (proposing additional instruction immediately after the end of the school day); Email from Parents to School Nurse J. Sullivan (May 2, 2019) [Doc. No. 8-47 at 19–20] (describing the incident).

[39] N.T. Joseph Milnes, Supervisor of Special Education for District, at 844 [Doc. No. 8 at 115].

[40] *Id.* at 845, 850–53 [Doc. No. 8 at 115, 116–17]. There is substantial evidence in the record that Student's conditions did not impede learning for himself or others at school.

intermittent homebound instruction, but that the District would not approve homebound instruction as a replacement for Student not attending school for "weeks on end."[41]

The Hearing Officer determined that "the decision to grant or deny homebound instruction is a regular education decision outside [his] jurisdiction."[42] The Hearing Officer further determined that, by a preponderance of the evidence, Parents had failed to prove deliberate indifference.[43]

Parents correctly argue that the deliberate indifference standard does not apply,[44] but have not shown that the District violated Section 504 under the correct standard. "Although [Plaintiffs] need not prove deliberate indifference to obtain declaratory, injunctive, or equitable relief under the Rehabilitation Act, [they] must still establish that the District is liable under the Act based on a failure 'to ensure meaningful participation in educational activities and meaningful access to educational benefits.'"[45] Upon consideration of the administrative record, Plaintiffs have not shown that Student was "denied the benefits of the program or was otherwise subject to discrimination because of [his] disability."[46]

Further, in Pennsylvania, "[t]he relevant statutes and regulations include provisions authorizing, but not requiring, schools to temporarily excuse students from attendance in school

---

[41] *Id.* at 855, 860 [Doc. No. 8 at 118, 119].

[42] Hearing Officer Decision at 42 [Doc. No. 8 at 50].

[43] *Id.*

[44] *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262 (3d Cir. 2013) (citations and quotations omitted) (We stated that . . . to establish a § 504 violation, a plaintiff need not prove that defendants' discrimination was intentional.")

[45] *K.K. ex rel. L.K. v. Pittsburgh Pub. Sch.*, 590 F. App'x 148, 153 (3d Cir. 2014) (citing *Ridley,* 680 F.3d at 280). Quoting from the decision in *K.K.*, Plaintiffs contend the homebound instruction "is a stopgap procedure designed to give temporarily homebound students a reasonable opportunity to maintain pace with their coursework during a limited absence from the classroom setting" and argue that the failure to provide homebound constituted a denial of benefits. Pl.'s Reply Supp. Judgment [Doc. No. 24] at 5 (quoting *K.K.*, 590 F. App'x at 154).

[46] *T.F. v. Fox Chapel Area Sch. Dist.*, 589 F. App'x 594, 600 (3d Cir. 2014) (citations and quotations omitted).

under certain circumstances and authorizing, but not requiring, schools to offer homebound instruction during the aforementioned periods of excused absence."[47] Under these provisions:

> A school district . . . may provide students temporarily excused under this section with homebound instruction for a period not to exceed 3 months. A school district. . . may request approval from the Department to extend the provision of homebound instruction, which shall be reevaluated every 3 months. When a student receives homebound instruction, the student may be counted for attendance purposes as if in school. . . .[48]

It does not appear that full homebound instruction, or a replacement for in-person schooling, was sought in either 8th grade or 9th grade. The correspondence, including that from the doctors, refers to requests for supplemental or intermittent homebound instruction, or homebound instruction until appropriate supports were provided.[49]

In the Spring of 2019, the District agreed to provide intermittent homebound instruction. Unfortunately, soon after instruction started, the incident with the teacher in the home occurred. As a result, the District determined that such educational services would have to be provided elsewhere. It remains an open question as to whether the District should have made additional efforts to continue with the intermittent services despite the incident. However, even without the approved homebound instruction, Student attended school regularly for the remainder of the school year and successfully completed the 8th grade. No denial of a FAPE has been established.

---

[47] *Price v. Commonwealth Charter Acad.-Cyber Sch.*, No. 18-1778, 2019 WL 3816788, at *6 (E.D. Pa. Aug. 13, 2019).

[48] 22 Pa. Code § 11.25; *see also* 24 P.S. § 13-1329(a) (when school districts may excuse students from temporarily attending school for urgent reasons).

[49] *See*, *e.g.*, Letter from physician (Apr. 4, 2019) [Doc. No. 8-46 at 18] (stating that Student would "greatly benefit from intermittent homebound instruction" while missing days of school for medical treatment); Letter from physician (Apr. 30, 2019) [Doc. No. 8-46 at 66–69], and Doc. No. 8-47 at 1] (supporting request for intermittent homebound schooling for times Student "physically cannot be in school). Letter from physician (Oct. 1, 2019) [Doc. No. 8-29 at 51] (stating that Student should receive homebound instruction until appropriate plans were in place at school).

Student's 9th grade year began in September 2019. The Due Process hearing was underway, and it may have contributed to the increasingly strained communications between the District and Parents. The District stated that Student did not attend most days, even though accommodations had been made, including a nurse available to support Student at school.[50] Student's mother stated that they felt unsafe, intimidated, and threatened by the District's actions, particularly in reporting Student truant in the wake of serious medical issues and the death of two family members.[51] The District informed Student's mother that it could "no longer allow you to control and twist the narrative with regard to the District's ability to effectively support [Student] in the high school setting and our willingness to work collaboratively with your family,"[52] and Student's mother responded with assertions that the District was not responding to Student's needs, including that on one of the days when Student had attended school, the one-on-one nurse was unavailable.[53]

On October 1, 2019, one of Student's physicians wrote a letter stating that Student "has not been consistently attending school since the beginning of the year due to significant anxiety and behavioral concerns . . . related to not having the right accommodations in place for him to safely attend school."[54] The letter stated that until appropriate plans could be put into place and a meeting held with his parents, Student should receive homebound instruction.[55] The parties

---

[50] Email from J. Milnes to Parents (Sept 13, 2019) [Doc. No. 8-29 at 14] (stating that Student had missed eight of the first 13 days); Email from J. Milnes to Parents (Sept. 25, 2019) [Doc. No. 8-29 at 22] (stating that Student missed 16 of the first 21 days).

[51] Email from Parents to Assistant Principal (Sept. 25, 2019) [Doc. No. 8-29 at 23]; Email from Parents to J. Milnes (Sept. 25, 2019) [Doc. No. 8-29 at 26–27].

[52] Email from J. Milnes to Parents (Sept. 26, 2019) [Doc. No. 8-29 at 26].

[53] Email from Parents to J. Milnes (Sept. 26, 2019) [Doc. No. 8-29 at 32–34].

[54] Letter from physician (Oct. 1, 2019) [Doc. No. 8-29 at 51].

[55] *Id.*

continued to exchange emails regarding Student's medical needs, attendance issues, and support plans; but no accords were reached, and Student did not attend class. Two additional physicians recommended homebound education services for Student, but the District stated that it was imperative for Student to return to regular school attendance first.[56] By November 1, 2019, Student was registered in another school district.[57]

As the Hearing Officer noted, the record demonstrates that, by this time, there was a marked loss of "communication, trust and civility" between Parents and the District.[58] Although Student had always had absences from school, the parties had previously agreed upon the importance of Student attending school and his ability to do so. The physician letters from the fall of 2019 speak only to the need for accommodations; they do not state that Student could not attend school, and do not address the fact that the District had arranged for one-on-one nursing support for Student. The record does not support Parents' contention that the District discriminated against Student in violation of Section 504 with regard to homebound instruction.

### III.    CONCLUSION

Upon review of the administrative record, the Court concludes that Plaintiffs have failed to show by a preponderance of the evidence that the District denied Student a FAPE. This decision is limited to that issue and the Court has not made any determination as to the District's motivation in removing the Section 504 Plan. Defendant's motion for summary judgment on the first cause of action will be granted and Plaintiffs' motion will be denied. An order will be entered.

---

[56] Email from J. Milnes to Parents (Oct. 28, 2019) [Doc. No. 8-30 at 31].

[57] Email from J. Milnes to Parents (Nov. 1, 2019) [Doc. No. 8-30 at 38].

[58] Hearing Officer Decision at 47 [Doc. No. 8 at 55].